**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

LARRY WAYNE JONES,                                                                                                    PLAINTIFF
ADC #708998

v.                                                          No. 5:09CV00157 JLH

RAY HOBBS, Chief Deputy Director,
Arkansas Department of Correction; and
CHARLES FREYDER, Chaplain                                                       DEFENDANTS

**OPINION AND ORDER**

Larry Jones brings this action against Ray Hobbs, the Chief Deputy Director of the Arkansas Department of Correction, Charles Freyder, a Department of Correction chaplain, and other officers of the Department of Correction, alleging violations of his rights under the free exercise and free speech clauses of the First Amendment, the Fourteenth Amendment, and the Religious Land Use and Institutionalized Persons Act. The defendants previously moved for summary judgment, and the Court adopted the magistrate judge's proposed findings and recommended partial disposition dismissing a number of Jones' claims as well as two of the defendants. Consequently, Jones' only remaining claims are those asserted against Hobbs and Freyder, in their official and individual capacities, for denying his request for a special religious diet for sixteen months in violation of the free exercise clause. The defendants have moved for summary judgment a second time. The magistrate judge recommends that the motion be granted in part and denied in part. The defendants have entered objections to the proposed findings and recommendations. For the following reasons, the defendants' objections are overruled and the motion for summary judgment is granted in part and denied in part.

**I.**

It is undisputed that, in January of 2007, Jones became a non-denominational Christian and requested a modified diet that would accord with his religious tenets. Jones testified that his religious beliefs require him to abstain from animal products or any food that has touched a tray or plate that also contains animal products. Prior to 2007, Jones received a vegan diet—which, when combined with the prison's vegetarian diet, was equivalent to the diet required by his religious beliefs—based on a medical prescription for a food allergy. However, his prescription expired in January of 2007 and he was denied his requested diet. As noted, a vegetarian diet was available, but included butter, cheese, and eggs, which was unacceptable and which, thereby, rendered the acceptable part also forbidden. In April of 2008, Jones was provided with a diet that complied with his religious restrictions.[1] He concedes that he cannot offer any evidence that he suffered a physical injury as a result of the prison's refusal to provide him with the requested religious diet.[2]

---

[1] There is a factual dispute about whether Jones began to receive a vegan diet based on a new medical prescription or because of the prison's decision to create a new vegan diet. *Compare* Doc. #47, p. 9 (Jones' affidavit testimony that his medical prescription allowed him to receive an acceptable meal from April of 2005 until the date of the affidavit), *with* Doc. #98-8 (Yolanda Clark's affidavit testimony that Jones was provided a vegan diet which was created in May of 2008).

[2] The magistrate's proposed findings and recommendations indicate that the parties do not dispute that, during the sixteen months Jones was denied a vegan diet, other inmates were served vegan meals. The defendants deny that this fact is undisputed and point to affidavit testimony to support the proposition that Jones "was the first inmate to received the Vegan Diet." Doc. #98-8. Although Clark testified that Jones received "the Vegan Diet since its inception in May 2008[,]" she does not indicate whether other inmates may have received a diet which was vegan in nature for other reasons; for example, based on a medical prescription. *Id.* On the other hand, the Court has perused the record and found no evidence supporting the conclusion that the undisputed evidence establishes that other inmates received a vegan diet, or the equivalent of a vegan diet, from January of 2007 until April of 2008.

## II.

A court should enter summary judgment if the evidence demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986). The moving party bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). If the moving party meets this burden, the nonmoving party must respond by coming forward with specific facts establishing a genuine dispute for trial. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). In deciding a motion for summary judgment, a court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *PHL Variable Ins. Co. v. Fulbright McNeill, Inc.*, 519 F.3d 825, 828 (8th Cir. 2008). A genuine dispute exists only if the evidence is sufficient to allow a jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511. When a nonmoving party cannot make an adequate showing sufficient to establish a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322-23, 106 S. Ct. at 2552.

## III.

The defendants contend that they are entitled to summary judgment because qualified immunity bars Jones' free exercise claims asserted against them in their individual capacities, the Prison Litigation Reform Act bars Jones' request for monetary damages, and the Eleventh Amendment bars Jones' claims for monetary damages brought against them in their official capacities.

3

The magistrate concluded that the defendants were not entitled to summary judgment based on qualified immunity or the PLRA. However, the magistrate found that the defendants were entitled to summary judgment on the official capacity claims for monetary damages. The defendants have filed objections to the magistrate's proposed findings and recommendations. Upon a de novo review of the record and for the reasons discussed below, the Court concludes that summary judgment is not appropriate as to the defendants' qualified immunity defense or based on their PLRA argument.

**A.    Qualified Immunity**

As the magistrate explained, the defendants are entitled to qualified immunity unless they violated a statutory or constitutional right which was "clearly established" at the time. *Ashcroft v. al-Kidd*, --- U.S. ----, 131 S. Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011). In the context of a free exercise claim, the Court must first address "the threshold issue of whether the challenged governmental action 'infringes upon a sincerely held religious belief[.]' " *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 983 (8th Cir. 2004) (quoting *Hamilton v. Schriro*, 74 F.3d 1545, 1550 (8th Cir. 1996)). If so, the Court then applies the Supreme Court's *Turner* factors to determine if the regulation restricting the religious practice is "reasonably related to legitimate penological interests." *Gladson v. Iowa Dep't of Corr.*, 551 F.3d 825, 831 (8th Cir. 2009) (internal quotation marks omitted) (quoting *Murphy*, 372 F.3d at 982 (quoting *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261, 96 L. Ed. 2d 64 (1987))). The four factors that guide the Court's analysis are: (1) whether there is a valid rational connection between the prison regulation and the government interest in justifying it; (2) whether there is an alternative means of exercising the right that remain open to prison inmates; (3) whether the accommodation will have a significant "ripple effect" on guards and other inmates and on the allocation of prison resources; and (4) whether there is an alternative that

fully accommodates the prisoner at *de minimis* cost to valid penological interest. *Turner*, 482 U.S. at 90. If the impediment is not reasonably related to legitimate penological interests and, consequently, the defendants violated Jones' statutory or constitutional rights, then the Court must determine whether the violated right was "clearly established."

For the purposes of summary judgment, the defendants concede that Jones' religious beliefs, which require him to maintain a vegan diet, are sincerely held. *See* Doc. #96, p. 11; Doc. #102-3, p. 33. However, the defendants contend that their conduct did not infringe upon Jones' religious beliefs because they are not authorized to provide Jones with the specific diet he requested and they have engaged in no action to impede or prevent him from receiving a satisfactory diet.

Jan Scussel, the Chief Legal Counsel for the Department of Correction, testified by affidavit that the prison had an "Administrative Directive" concerning religious diets in effect during the time Jones' requested diet was denied. Doc. #98-6. Decisions about what religious diets were to be made available were made by the chaplains, in connection with food services and Central Office Administration. *Id.* Further, religious diets were to be approved by a dietician prior to being served. *Id.* According to Scussel, Hobbs "had input on what could be a religious diet, but he was not authorized to unilaterally order or fulfill 'Special Religious Diet' requests from inmates." *Id.* Hobbs confirmed in his testimony that chaplains, along with food services and the administration, have the final authority to determine what religious diets were made available, Doc. #102-1, p. 12-13, but stated that he had the power to change the prison's policies regarding food service. *Id.* at p. 8-9. Additionally, Hobbs testified that he could have told food services to provide the vegetarian diet to Jones without the offensive ingredients. Doc. #102-2, p. 30. Hobbs also testified that he was aware that Jones had stated in his religious affiliation update that he could not eat anything from a tray or

5

plate that also contains animal foods. *Id.* at 31. Freyder testified by affidavit that he "had the authority to forward [an] inmate's request [for a 'Special Religious Diet'] to the kitchen supervisor for implementation." Doc. #103-1. Nevertheless, according to Freyder, he "was not authorized to forward an inmates request" for a "Special Religious Diet" that was not offered in the department. Hobbs testified, however, that Freyder had recommended that the vegetarian diet was best suited to Jones' religious requirements. Doc. #102-2, p. 29-30.

Based on this evidence, the Court cannot say as a matter of law that the defendants' conduct did not impede Jones' efforts to secure a diet which comported with the dictates of his religion. Taken in the light most favorable to Jones, the evidence indicates that the defendants, along with others, had the power to authorize a vegan diet pursuant to prison policy but neglected to do so after Jones requested such a diet based on his religious convictions. *Cf. Floyd v. Trice*, 490 F.2d 1154, 1157 (8th Cir. 1974) (defendant need only be "partially responsible" for the alleged constitutional violations). Furthermore, Hobbs was aware that Jones has requested a vegan diet and had the power to order that prison staff provide Jones with a vegan diet regardless of the prison policy, but refused to do so, in part, because Freyder had told him that a vegetarian diet was sufficient.

Because Jones has raised a fact question regarding whether the defendants infringed on his sincerely held religious beliefs, the Court must apply the *Turner* factors to determine whether the denial of Jones' request for a vegan meal based was "reasonably related to legitimate penological interests."

First, the Court considers whether there is a valid rational connection between the prison regulation and the government interest in justifying it. The prison's directive on religious diets states that the prison strives to meet recognizable religious diets in a manner that is cost efficient, fair, and

comports with security needs. *See* Doc. #98-6. The defendants contend that two penological interests identified in the directive would have been potentially impacted by Jones' request for a vegan diet. First, the defendants contend that providing Jones with a vegan diet would not have been financially feasible because "[i]t would not be cost efficient for the ADC to accommodate every inmate's special diet request, as there are more than 15,000 inmates housed in the department, each of who have varying preferences." Second, the defendants contend that providing Jones with a special diet could implicate jail security because "[i]f one inmate if offered something that the other inmates are not, the inmate receiving the special or preferential treatment is at a risk from other inmates, due to the perceived elevated status[,]" and because the security staff would be burdened with additional security and monitoring assignments needed "to ensure the inmate's safety, so that other inmates did not attempt to take the special food from the inmate who had requested it."

The magistrate recognized that fiscal concerns are generally legitimate, but concluded that the fact that Jones was provided with a vegan diet before and after the sixteen month period at issue undermined the defendants' contention that to provide such a diet was not economically feasible. The defendants respond by pointing out that Jones' previous vegan diet was based on a medical prescription. According to the defendants, this fact is crucial for two reasons. First, because inmates do not normally "fight over" medical prescriptions, but are likely to fight when "one inmate, presumably for no other reason than to say 'I want it' receive something he requests 'just because.'" Second, because each of the nearly 16,000 inmates do not have medical prescriptions for certain diets, but each inmate could request a special diet simply because they wanted a special diet. The defendants argue that the prison could not provide 16,000 special diets where the inmates' basis for the request is simply, " 'I want it.' "

7

The defendants' objections miss the mark because the basis for Jones' request for food was not merely his personal preference, but rather his sincerely held religious beliefs. The defendants point to no evidence tending to establish a realistic risk that each of the nearly 16,000 inmates might ruin the prison financially by requesting unique meals based on sincerely held religious beliefs. In fact, Hobbs testified that the prison's directive regarding religious diets distinguishes between a request for a diet based on a sincerely held religious belief and one based on a personal preference. Doc. #102-1, p. 11. Similarly, the defendants point to no evidence that inmates would "fight [with another inmate] over" a special diet provided to the inmate on the basis of that inmate's sincerely held religious beliefs. As the magistrate noted, Jones received a vegan diet before January of 2007 and after April of 2008 without, apparently, sparking any security incidents or special protection needs. Indeed, it is somewhat difficult to believe that most inmates would fight with Jones over a vegan meal. *See Love v. Reed*, 216 F.3d 682, 691 (8th Cir. 2000). Finally, Hobbs testified that it would be no more trouble to provide Jones with the diet based on his religious beliefs than it would be to do so based on his medical needs. Doc. #102-3, p. 35. This testimony tends to undermine the defendants' efforts to distinguish between special diets based on religious views and special diets based on medical needs.

Even if financial and security concerns may hypothetically justify the denial of an inmate's requested religious diet, as the prison directive itself contemplates, in the instant case there is evidence that the denial of Jones' request for a vegan diet was not rationally connected to any existing economic or security concerns. Construing the evidence in the light most favorable to Jones, the magistrate did not err in concluding that a genuine issue of material fact exists as to the first *Turner* factor.

Respecting the second *Turner* factor, the Court must determine whether an alternative means of exercising his religious rights remain open to Jones. The defendants contend that Jones could exercise his religious rights by praying, reading his Bible, request religious materials from the library, take Bible correspondence courses, and have visits from a pastoral advisor. However, as the magistrate noted, Jones testified that he has only a limited ability to study, pray, and counsel with others. Further, Jones was unable to attend church services, access television or radio religious programming, or purchase an appropriate diet through the prison's commissary. Nonetheless, the defendants contend that Jones' alternative means of exercise his religious rights were sufficient.

If Jones sincerely believes that eating animal products or food which has touched animal products is a serious violation of his religious tenets, it is difficult to see how his ability to pray, read his Bible, or order religious items from the library would be sufficient to satisfy his religious obligations regarding his diet. Nevertheless, even if the alternatives are no substitute for the dietary edicts of Jones' religion, the second factor favors the defendants if Jones was still able to practice some of the tenets of his religion. *See Iron Eyes v. Henry*, 907 F.2d 810, 815 (8th Cir. 1990); *Garza v. Carlson*, 877 F.2d 14, 16 (8th Cir. 1989) (citing *Estate of Shabazz*, 482 U.S. 342, 351-52, 107 S. Ct. 2400, 2405-06, 96 L. Ed. 2d 282 (1987)). However, there appears to be a conflict between the defendants' account of Jones' ability to pray, read the Bible, et cetera, and Jones' testimony that his ability to study, pray, and counsel with others is limited. Based on this record, the question cannot be resolved as a matter of law. Regardless, even if the undisputed evidence established that Jones had sufficient alternative means to practice his religion, this factor still must be balanced against the other *Turner* factors.

As to the third *Turner* factor, the Court must address whether providing Jones with a vegan meal would have a significant "ripple effect" on guards and other inmates and on the allocation of prison resources. The defendants reiterate their economic and security concerns, and also contend that Jones' request for a special diet, when given the sort of universality proper to a categorical imperative, would implicate the fairness factor and burden the dietician. For the reasons discussed in the analysis of the first *Turner* factor, the Court cannot say as a matter of law that continuing to provide Jones with a vegan meal based on his religious beliefs rather than his medical prescription would have a significant ripple effect with respect to any of the concerns articulated by the defendants. Construing the evidence in the light most favorable to Jones, the magistrate did not err in concluding that a material fact question exists as to the third *Turner* factor.

Finally, regarding the fourth *Turner* factor, the Court considers whether there is an alternative way to fully accommodates Jones' request for a vegan meal at *de minimis* cost to valid penological interests. The defendants again focus on the economic feasibility of providing each inmate with a special diet, especially where the request may require the prison to order special food. As the magistrate noted, Jones argues that the prison could avoid this concern by applying a two step process to all religious diet requests: First, determine if the belief is sincerely held; and, second, determine if the request is feasible. Jones' suggested alternative procedure would avoid the problem of requiring that the requested religious diet already be "recognized." However, Jones' proposed procedure appears similar in nature to the prison's directive on religious diets since, presumably, the chaplains, administrators, and food service personnel would have to collaborate to determine whether a particular diet was feasible. That is, Jones' second step would probably entail the same efforts as those needed to "recognize" a particular religious diet pursuant to the prison's directive. On the other

hand, there is evidence that the prison had only two "recognized" religious diets: one for Jews and Muslims. *See* Doc. #102-1, p. 12. To the extent that the prison required a requested religious diet to be one mandated by a "recognized" religion, Jones' alternative procedure would be vastly superior from a constitutional vantage. The Court doubts that the prison's directive regarding religious diets can be interpreted to only provide diets required by "recognized" religions. Nevertheless, because the similarities (and differences) between Jones' proposed alternative and the prison's directive are murky, the Court concludes that the magistrate did not err in finding that a genuine issue of material fact exists as to the fourth *Turner* factor.

Regardless of whether Jones has identified a truly distinct procedure that creates a *de minimis* cost to the prison's economic and security interests, the Court cannot say as a matter of law that the *Turner* factors balance in the defendants' favor and, consequently, that the denial of Jones' request for a vegan diet did not run afoul of Jones' constitutional rights.

Next, the Court must determine whether Jones' right to a diet which comported with the requirements of his religious beliefs was not clearly established. The defendants point out that Jones previously initiated a lawsuit against them, and others, alleging that he was deprived of a special religious diet based on his different religious beliefs from those he adopted in January of 2007. A jury trial resulted in a verdict for the defendants. Based on this verdict, the defendants contend that they reasonably believed that they were not violating Jones' rights when his request for a vegan diet was denied for sixteen months.

Prior to 2007, however, it was "well settled that jail and prison inmates 'have the right to be provided with food sufficient to sustain them in good health [and] that satisfies the dietary laws of their religion.' " *Kind v. Frank*, 329 F.3d 979, 981 (8th Cir. 2003) (quoting *McElyea v. Babbitt*, 833

11

F.2d 196, 198 (9th Cir.1987)). The prior defense verdict does not as a matter of law shield the defendants from liability for subsequent denials of this right. Perhaps the jury concluded that the plaintiff had failed to show that his request was not based on sincere religious beliefs. However, the instant action is based on different religious beliefs than the earlier case. In light of the well-established rule that "prison inmates are entitled to reasonable accommodation of their religious dietary needs," *Love*, 216 F.3d at 689, the Court cannot say as a matter of law that Jones' right to a diet suiting his religious beliefs was not a clearly established right.

Therefore, the magistrate correctly denied summary judgment as to the defendants' qualified immunity defense to Jones' free exercise claims.

**B.    Prison Litigation Reform Act and Sovereign Immunity**

As noted, the magistrate held that the PLRA did not bar Jones' claims, and that Jones was entitled to proceed against the defendants in their official capacities for injunctive relief. However, the magistrate found that the defendants were entitled to summary judgment on Jones' official capacity claims seeking monetary damages. In their objections, the defendants offered no criticisms regarding the magistrate's discussion regarding the PLRA and sovereign immunity defense. The Court adopts the magistrate's analysis as to these issues.

## CONCLUSION

For the foregoing reasons, Hobbs and Freyder's objections to the proposed findings and recommendations are OVERRULED. The defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Document #95. Summary judgment is granted on Jones' claims for monetary damages asserted against the defendants in their official capacities. These claims are dismissed with prejudice. Summary judgment is denied in all other respects.

IT IS SO ORDERED this 5th day of April, 2012.

                                      */s/ J. Leon Holmes*

                                      J. LEON HOLMES
                                      UNITED STATES DISTRICT JUDGE